KAREN P. HEWITT
United States Attorney
DAVID D. LESHNER
Assistant U.S. Attorney
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-7163
David.Leshner@usdoj.gov

Attorneys for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal Case No. 08-CR-0401-H |
| Plaintiff, | DATE:    March 24, 2008 |
| v. | TIME:    2:00 p.m. |
| LUIS ENRIQUE CRUZ-VALLES, | **UNITED STATES' RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS TO:** |
| Defendant. | **(1) DISMISS THE INDICTMENT;** |
| | **(2) COMPEL DISCOVERY; AND** |
| | **(3) ORDER AN A-FILE VIEWING** |

COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, Karen P. Hewitt, United States Attorney, and David D. Leshner, Assistant United States Attorney, and hereby files its response and opposition to defendant Luis Enrique Cruz-Valles's motions to dismiss the indictment, to compel discovery and for an order compelling an A-File viewing in the above-referenced case. Said response is based upon the files and records of this case together with the attached memorandum of points and authorities.

/ / /

/ / /

/ / /

/ / /

# MEMORANDUM OF POINTS AND AUTHORITIES

## I

## STATEMENT OF THE CASE

On February 15, 2008, a one-count indictment was filed charging defendant Luis Enrique Cruz-Valles with a violation of Title 8, United States Code, Sections 1326(a) and (b). Defendant was arraigned on the indictment on February 28, 2008 and entered a plea of not guilty.

## II

## STATEMENT OF FACTS

**A.    Defendant's Apprehension**

On December 26, 2007, Border Patrol agents were performing surveillance of a residence in National City, California. At approximately 11:00 a.m., Defendant exited the residence. Agents approached Defendant, identified themselves and inquired as to his identity and immigration status. Defendant responded that his name is Luis Enrique Cruz-Valles and that he is a citizen of Mexico without any documents allowing him to enter or remain in the United States. Agents then placed Defendant under arrest.

At approximately 12:54 p.m. on December 26, Defendant received <u>Miranda</u> warnings and agreed to make a statement. Defendant again admitted to being a Mexican citizen without documents allowing him to enter or remain in the United States. According to Defendant, he previously had been deported and had re-entered the United States on November 30, 2007.

**B.    Defendant's Immigration History**

Defendant is a citizen of Mexico. On August 1, 2005, Defendant was removed from the United States to Mexico pursuant to an Order of an Immigration Judge.

**C.    Defendant's Criminal History**

The Government's motions for fingerprint exemplars and reciprocal discovery sets forth Defendant's criminal history.

/ / /

/ / /

/ / /

1

**III**

2

## MOTION TO DISMISS THE INDICTMENT

3

**A.    Introduction**

4        Defendant attempts to collaterally attack his August 2005 removal under 8 U.S.C. § 1326(d) on

5    the grounds that the removal order was fundamentally unfair because the Immigration Judge may not

6    have advised Defendant that he might have a claim to derivative citizenship.  Defendant further claims

7    that he suffered prejudice because, in fact, he is a derivative citizen.  Defendant is wrong.

8        As a preliminary matter, Defendant's motion is premature.  The motion is based on the

9    Immigration Judge's alleged failure to advise Defendant that he may be a derivative citizen, but it is

10   apparent that Defendant is unsure what the Immigration Judge did or did not tell him.  Thus, the entire

11   predicate of Defendant's motion – an alleged failure of the Immigration Judge to advise him – may or

12   may not be correct.  Defendant's motion is, in effect, a request for an advisory opinion based on a

13   hypothetical scenario.

14       The recording from Defendant's 2005 removal hearing has been ordered but has not yet arrived.

15   The Government will produce in discovery a copy of the deportation tape when it arrives.  In the

16   interim, the Court should deny the motion without prejudice to allow Defendant to bring it in the

17   ordinary course if the deportation tape establishes that the Immigration Judge did not discuss a potential

18   derivative citizenship issue with Defendant.

19       Defendant's motion also fails on the merits because he cannot meet his burden of establishing

20   prejudice.  Of critical importance is the <u>undisputed</u> fact that the United States citizen from whom

21   Defendant claims to have derived citizenship is <u>not his natural father</u>.  Under federal law, the existence

22   of a blood relationship with a United States citizen father is an essential prerequisite for a child born out

23   of wedlock to a non-United States citizen mother to derive citizenship.  Because there is no dispute that

24   Defendant seeks to establish his citizenship through his step-father – with whom he concedes he has no

25   blood relationship – Defendant cannot be a derivative citizen as a matter of law.

26   / / /

27   / / /

28   / / /

**B.**     <u>Legal Standards</u>

To successfully collaterally attack his August 2005 removal under § 1326(d), Defendant must show that (1) he exhausted all his administrative remedies available to appeal his removal order; (2) the underlying removal proceedings at which the order was issued improperly deprived him of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair. <u>United States v. Ubaldo-Figueroa</u>, 364 F.3d 1042, 1048 (9th Cir. 2004). "An underlying removal order is 'fundamentally unfair' if: (1) [a defendant's] due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects." <u>Id.</u> (citation omitted). Defendant bears the burden of establishing prejudice resulting from any defect in the removal proceeding. <u>United States v. Gonzalez-Valerio</u>, 342 F.3d 1051, 1054 (9th Cir. 2003). Here, Defendant has failed to meet his burden because he cannot demonstrate that he is a derivative citizen and that he therefore suffered prejudice resulting from the Immigration Judge's possible failure to advise him that he may be a derivative citizen.

**C.**     <u>Defendant Has Failed To Establish That He Is A Derivative Citizen.</u>

**1.**     <u>Factual background.</u>

It is undisputed that Defendant was born in Mexico in April 1975 and that his biological parents were Mexican citizens. It also is undisputed that Defendant was born out of wedlock.

At some point subsequent to Defendant's birth, his natural mother apparently began a relationship with a United States citizen, Jose Gogue Cruz. It is unclear from Defendant's motion papers or the late-filed declaration of Mr. Cruz whether Mr. Cruz ever married Defendant's mother. However, for purposes of this motion, the critical fact is that Mr. Cruz admittedly is not Defendant's natural father and thus shares no blood relationship with Defendant. [Cruz Declaration, ¶ 3.]

According to documents produced by Defendant, on April 29, 1979, Jose Gogue Cruz and Defendant's mother appeared before an Official of the Civil Registry in Tijuana, Mexico. Mr. Cruz represented himself to be Defendant's natural father, and a birth certificate was issued listing Mr. Cruz as Defendant's father. [Motion, Exh. A.] This representation that Mr. Cruz was Defendant's father was untrue. [Cruz Declaration, ¶ 3.]

/ / /

2.      **Federal law requires a biological relationship to establish derivative citizenship.**

Determination of derivative citizenship claims involving issues of legitimation may require application of federal, state and even foreign law. But the Court need not delve into state or foreign law pertaining to legitimation because the Immigration and Nationality Act ("INA") bars Defendant's derivative citizenship claim as a matter of federal law.

"There are two sources of citizenship, and two only: birth and naturalization." Miller v. Albright, 523 U.S. 420, 423 (1998). "If a person is not born in the United States, he or she can acquire citizenship at birth only as provided by Congress." Scales v. I.N.S., 232 F.3d 1159, 1164 (9th Cir. 2000).

Analysis of Defendant's derivative citizenship claim under the INA entails a multi-step process. First, Defendant must satisfy the requirements of 8 U.S.C. § 1409(a), which applies to a child born out of wedlock to a U.S. citizen father and an alien mother. Second, if Defendant satisfies § 1409(a)'s requirements, he then must demonstrate his eligibility for derivative citizenship under 8 U.S.C. § 1401. The absence of a blood relationship between Defendant and the person he claims as his father is fatal to Defendant's derivative citizenship claim under the INA.

a.      **A biological relationship is an essential prerequisite under 8 U.S.C. § 1409(a).**

"The applicable law for transmitting citizenship to a child born abroad when one parent is a U.S. citizen is the statute that was in effect at the time of the child's birth." United States v. Viramontes-Alvarado, 149 F.3d 912, 915 (9th Cir. 1998). At the time of Defendant's birth in 1975, 8 U.S.C. § 1409(a) provided:

> The provisions of paragraphs (3), (4), (5), and (7) of section 301(a) [8 U.S.C. § 1401]
> . . . shall apply as of the date of birth to a child born out of wedlock . . . if the **paternity**
> of such child is established while such child is under the age of twenty-one years by
> legitimation.

8 U.S.C. § 1409(a) (1952) (emphasis added). The central issue here is whether the term "paternity" is synonymous with a blood relationship. If "paternity" means blood relationship, then Defendant's non-biological stepfather cannot establish paternity under § 1409(a) as a matter of law.

1    Defendant attempts to gloss over the meaning of paternity by arguing that the 1986 amendment

2    to § 1409(a) added an explicit blood relationship requirement and that the pre-1986 version of § 1409

3    therefore must not have included such a requirement. But defendant cites no authority in support of his

4    interpretation of § 1409. This is perhaps unsurprising, because decisions from the Supreme Court, the

5    Ninth Circuit and this District, as well as § 1409(a)'s legislative history, compel the conclusion that

6    "paternity" requires a blood relationship.

7                    **i.        Supreme Court precedent**

8    In <u>Miller v. Albright</u>, 523 U.S. 420 (1998), the Supreme Court rejected a challenge to the post-

9    1986 version of § 1409(a). Specifically, the Court upheld § 1409(a)(4), which requires one of three

10   affirmative steps to be taken to provide citizenship to a child born out of wedlock to an alien mother in

11   another country: legitimation; a declaration of paternity under oath by the father; or a court order of

12   paternity. Although three pairs of justices wrote separately, of critical importance is the plurality

13   opinion of Justice Stevens joined by Chief Justice Rehnquist discussing the pre-1986 version of

14   § 1409(a):

15          The substantive requirement embodied in § 1409(a)(4) serves, at least in part, **to ensure**

16          **that a person born out of wedlock who claims citizenship birth actually shares a**

17          **blood relationship with an American citizen**. As originally enacted in 1952, § 1409(a)

18          required simply that 'the paternity of such child [born out of wedlock] is established

19          while such child is under the age of twenty-one years by legitimation' . . . **The section**

20          **offered no other means of proving a biological relationship**.

21                          *        *        *

22          The 1986 amendment also added § 1409(a)(1), which requires **paternity** to be

23          established by clear and convincing evidence, in order to deter fraudulent claims; but that

24          standard of proof was viewed as an ancillary measure, not a replacement for proof of

25          paternity by legitimation or a formal alternative.

26   <u>Id</u>. at 435-36 (emphasis added). Justice Stevens's opinion makes clear that both the pre-1986 and post-

27   1986 versions of § 1409(a) require "a biological relationship" with an American citizen and that the term

28   "paternity" in the pre-1986 statute meant just that. Moreover, Justice Stevens himself refers to the

1   "paternity" requirement of post-1986 § 1409(a)(1), where the statute, in fact, uses the phrase "blood

2   relationship." The interchangeable use of "paternity" and "blood relationship" is further evidence that

3   these terms are synonymous under § 1409(a).

4       The Supreme Court's decision in <u>Nguyen v. I.N.S.</u>, 533 U.S. 53 (2001), provides further support

5   for the conclusion that § 1409(a) has always required a blood relationship. In upholding § 1409(a)(4)

6   against an equal protection challenge, the Supreme Court again recognized that "paternity" means a

7   biological relationship:

8       The first governmental interest to be served [by § 1409(a)(4)] is **the importance of**

9       **assuring that a biological parent-child relationship exists** . . . Section 1409(a)(4)'s

10      provision of three options for a father seeking to establish **paternity** – legitimation,

11      paternity oath, and court order of paternity – is designed to ensure an acceptable

12      documentation of paternity.

13  <u>Id</u>. at 62-63 (emphasis added). Simply put, <u>Miller</u> and <u>Nguyen</u> both support the proposition that

14  § 1409(a) has always required a biological relationship with a U.S. citizen parent, and the reference to

15  "paternity" in the pre-1986 version of § 1409(a) must be understood and interpreted as synonymous with

16  a blood or biological relationship.

17              **ii.      Ninth Circuit precedent**

18      In <u>Scales v. I.N.S.</u>, 232 F.3d 1159 (9th Cir. 2000), the Ninth Circuit analyzed the blood

19  relationship requirement of § 1409(a) in relation to a petitioner born in 1977, <u>i.e.</u>, when the pre-1986

20  § 1409(a) was in effect. The Court of Appeals recognized that "[t]he INA does expressly require a

21  blood relationship between a person claiming citizenship and a citizen father, if the person is born out

22  of wedlock." <u>Id</u>. at 1164. Although the Court concluded that the petitioner in that case was <u>not</u> born

23  out of wedlock (thereby rendering § 1409(a) inapplicable), the salient point is that the Ninth Circuit

24  clearly would have applied § 1409(a)'s blood relationship requirement <u>had</u> the petitioner been born out

25  of wedlock. <u>Id</u>.

26      The Ninth Circuit dealt with a similar issue in <u>Solis-Espinoza v. Gonzales</u>, 401 F.3d 1090 (9th

27  Cir. 2005). There, the petitioner born in Mexico in 1967 and claimed derivative citizenship by virtue

28  of a female U.S. citizen who was married to the petitioner's father at the time of petitioner's birth. <u>Id</u>.

1   at 1093.  The Ninth Circuit concluded that the petitioner was not born out of wedlock and that "the

2   blood relationship requirement of § 1409 does not apply to him . . . ." Id. at 1094.

3        Both Scales and Solis-Espinoza found § 1409(a)'s blood relationship requirement applicable to

4   individuals born out of wedlock prior to 1986.  Although the petitioners in those cases were themselves

5   not subject to the blood relationship requirement because they were not born out of wedlock, the

6   evidence before the Court in this case is that Defendant was born out of wedlock.  He thus is subject to

7   the blood relationship requirement under § 1409(a).  This is a requirement Defendant admits he cannot

8   meet.  [Cruz Declaration, ¶ 3.]

9                **iii.     Southern District precedent**

10       This is not the first case in which counsel for Defendant has advanced the argument that

11  § 1409(a)'s blood relationship should not apply to persons born before 1986.  In United States v.

12  Marguet-Pillado, 2007 WL 2070348 (S.D. Cal. July 16, 2007) (Gonzalez, C.J.), the Defendant claimed

13  derivative citizenship based upon facts strikingly similar to those here.  The defendant in Marguet-

14  Pillado (1) was born in Mexico in 1968; (2) both his  natural parents were Mexican citizens; (3) the

15  defendant's mother subsequently entered into a relationship with another man who held the defendant

16  out as his son; and (4) the non-biological "father" was named as the defendant's father on a Mexican

17  birth certificate filed almost five years after the defendant's birth.  Id. at *1.

18       The District Court rejected the defendant's argument that the pre-1986 version of § 1409(a) did

19  not require a blood relationship with a claimed U.S. citizen parent.  Relying primarily on Justice

20  Stevens's plurality opinion in Miller v. Albright, supra, the District Court reasoned:

21       The discussion in Miller makes clear the pre-1986 version of the statute focused on

22       "proving a biological relationship" and explicitly equates "paternity" with "biological

23       relationship." Id. at 435-36. The Court finds the 1986 amendments to the INA did not

24       change the underlying meaning of "paternity," which is synonymous with "biological

25       relationship." Where defendant indisputably lacks a biological relationship with Mr.

26       Marguet, defendant's argument for derivative citizenship contravenes the purpose and

27       intent of § 1409(a).

28  / / /

1   Id. at * 4.  Concluding that the absence of a blood relationship rendered the defendant ineligible for

2   derivative citizenship, the District Court denied the motion to dismiss indictment under § 1326(d).

3                 **iv.**      **Legislative history**

4        Given the weight of authority supporting the Government's interpretation of § 1409(a), the Court

5   need look no further to deny Defendant's motion.  Nevertheless, the statute's legislative history provides

6   additional support for the Government's interpretation.  The Report of the Senate Judiciary Committee

7   dated January 29, 1952 explains the effect of INA § 309 [8 U.S.C. § 1409] as follows:

8           Under the provisions of section 309 of the bill <u>a child born out of wedlock acquires the</u>

9           <u>citizenship status which it would have had at birth, if the birth had been legitimate</u>, if and

10         when the paternity of the child is established by legitimation while the child is under the

11         age of 21 years.

12   [Exhibit A, p. 39, emphasis added.]  Common sense dictates that he citizenship status a child "would

13   have had at birth, if the birth had been legitimate" refers to status conferred by natural parents.  This

14   legislative history is flatly inconsistent with Defendant's proposed interpretation of § 1409(a) which is

15   based on the citizenship of a non-biological parent.

16        The Court's analysis of Defendant's derivative citizenship claim should begin and end with an

17   interpretation of § 1409(a) consistent with judicial precedent and the statute's legislative history.

18   Defendant has not and cannot establish a blood relationship with his claimed father, and Defendant

19   therefore cannot be a U.S. citizen under § 1409(a).

20             **b.**      **Defendant cannot establish that he was legitimated under California or**

21                 **Mexican law.**

22        Assuming Defendant's interpretation of § 1409(a) were correct (which it is not), Defendant also

23   must establish that he was legitimated.  Legitimation may occur under the law of the domicile or

24   residence of the father or child.  <u>See</u> 8 U.S.C. § 1101(b)(1)(C).  Here, Defendant claims he was

25   legitimated under the law of California or under the law of Mexico.

26        At the time of Defendant's birth in 1975, California Civil Code § 230 governed legitimation.

27   <u>See</u> <u>Viramontes-Alvarado</u>, 149 F.3d at 912 (applying § 230 to a defendant born in 1962); <u>Solis-</u>

28   <u>Espinoza</u>, 401 F.3d at 1093-94 (applying § 230 to a petitioner born in 1967).  Section 230 provided:

1   The father of an illegitimate child, by publicly acknowledging it as his own, receiving

2   it as such, with the consent of his wife, if he is married, into his family, and otherwise

3   treating it as if it were a legitimate child, thereby adopts it as such; and such child is

4   thereupon deemed for all purposes legitimate from the time of his birth.

5   "The interpretation of Cal. Civ. Code § 230 is governed by the interpretation of the California courts."

6   Viramontes-Alvarado, 149 F.3d at 916.

7   Prior to § 230's repeal in 1976, California courts consistently held that legitimation under the

8   statute applied only to a natural or biological father.  As early as 1892, the California Supreme Court

9   interpreted § 230 as dealing with legitimation established through blood relationships:

10  Before passing to the merits of the discussion, we pause a moment to say that the verb

11  "adopts," as used in section 230, is used in the sense of "legitimates," and that the acts

12  of the father of an illegitimate child, if filling the measure required by that statute, would

13  result, strictly speaking, in the legitimation of such child, rather than in its adoption.

14  Adoption, properly considered, refers to persons who are strangers in blood;

15  legitimation, to persons where the blood relation exists.

16  Blythe v. Ayres, 96 Cal. 532, 559 (1892) (emphasis added); McDaniel v. Fleming, 172 F. Supp. 153,

17  155 (S.D. Cal. 1959) ("Blythe v. Ayres also construed the work 'adoption' as used within Section 230

18  as meaning in fact 'legitimation' . . .").

19  California appellate decisions subsequent to Blythe v. Ayres, supra, leave no doubt that

20  legitimation under § 230 could only be accomplished through a biological father.  Indeed, the California

21  Supreme Court expressly so held:  "[I]n every case in which legitimation under section 230 is an issue,

22  the party asserting that the statutory requirements were satisfied bears the burden of proving five

23  elements: (1) illegitimacy, (2) **paternity**, (3) public acknowledgment, (4) reception into the family, and

24  (5) treatment as legitimate.  In re Richard M., 14 Cal. 3d 783, 793 n.7 (1975) (emphasis added).  See

25  also id. at 793 ("The question of whether a **natural father** has 'received the child into his family' is

26  perhaps the most frequently litigated issue in cases involving section 230 legitimation.") (emphasis

27  added).  See also Estate of Flood, 217 Cal. 763, 767 (1933) (paternity is essential element of legitimation

28  under § 230, and it was for jury to determine whether petitioner was decedent's natural daughter); Estate

of De Roulet, 20 Cal. App. 3d 1072, 1076 n.4 (1971) ("Pursuant to Civil Code, section 230, an illegitimate child may be adopted by his natural father by public acknowledgment, etc."); Estate of Peterson, 214 Cal. App. 2d 258, 262 (1963) (holding respondent presented sufficient evidence that she was decedent's natural daughter and was legitimated under § 230).  Given that Defendant shares no blood relationship with Mr. Cruz, he cannot meet the essential elements of Civil Code § 230.

Defendant's assertion that he was legitimated under Mexican law fares no better.  The entirety of Defendant's argument rests upon a bare citation to alleged provisions of the Mexican Civil Code.  Yet Defendant cites not a single authority – be it case law, treatise or legislative history – interpreting these provisions.  As the foregoing analysis of 8 U.S.C. § 1409(a) demonstrates, proper interpretation of a statutory scheme requires more than reliance on naked statutory language shorn of interpretation or context.  Indeed, Defendant concedes that when Mr. Cruz "declared" himself Defendant's father before the Civil Registrar (Motion at 8), that declaration was untrue.  Under Defendant's interpretation of the statutes he cites, however, such a false declaration of paternity would be of no concern under Mexican law, and any man could legitimate a child by falsely claiming the child as his own before the Registrar.  The Court should decline Defendant's invitation to interpret Mexican law in such a counterintuitive fashion absent some compelling authority demonstrating that such an interpretation is correct.[1]

**c.    Defendant has not established that he was in the legal custody of Mr. Cruz at the time of legitimation.**

Assuming Defendant's interpretation of § 1409(a) were correct (which it is not) and that Defendant could demonstrate that he was properly legitimated under California or Mexican law (which he cannot), Defendant still must establish that he was "in the legal custody of the legitimating parent or parents at the time of such legitimation."  8 U.S.C. § 1101(b)(1)(C).  Defendant's motion ignores this statutory requirement that he be in the "legal custody" of Mr. Cruz, at the time of legitimation.  Defendant's failure to establish that he meets the legal custody requirement provides a separate and

---

[1]  On March 17, 2008, Chief Judge Gonzalez denied a motion for reconsideration of the order denying the defendant's § 1326(d) motion in United States v. Marguet-Pillado, supra.  The basis for the failed motion for reconsideration was the same argument raised by Defendant here concerning interpretation of the Mexican Civil Code.

08CR0401-H

1  independent ground for denying his motion.

2

3                                          **IV**

4                          **MOTION FOR DISCOVERY**

5          The Government has and will continue to fully comply with its discovery obligations. To

6  date, the Government has provided Defendant with 40 pages of discovery and one DVD, including

7  reports of his arrest, his rap sheet, and copies of immigration and conviction documents.

8          In an attempt at simplification, this memorandum will address two specific areas of discovery:

9  (1) items which the Government either has provided or will voluntarily provide; and (2) items demanded

10 and discussed by Defendant which go beyond the strictures of Rule 16 and are not discoverable.

11        **1.    Items which the Government has provided or will voluntarily provide.**

12                a.    The Government will disclose to Defendant and make available for inspection,

13 copying or photographing:  any relevant written or recorded statements made by Defendant, or copies

14 thereof, within the possession, custody, or control of the Government, the existence of which is known,

15 or by the exercise of due diligence may become known, to the attorney for the Government; and that

16 portion of any written record containing the substance of any relevant oral statement made by Defendant

17 whether before or after arrest in response to interrogation by any person then known to Defendant to be

18 a Government agent.  The Government also will disclose to Defendant the substance of any other

19 relevant oral statement made by Defendant whether before or after arrest in response to interrogation

20 by any person then known by Defendant to be a Government agent if the Government intends to use that

21 statement at trial.

22                b.    The Government will permit Defendant to inspect and copy or photograph books,

23 papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof,

24 which are within the possession, custody or control of the Government, and which are material to the

25 preparation of Defendant's defense or are intended for use by the Government as evidence during its

26 / / /

27

28

case-in-chief at trial, or were obtained from or belong to Defendant;[2]

c.      The Government will permit Defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are in the possession, custody or control of the Government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the Government, and which are material to the preparation of his defense or are intended for use by the Government as evidence during its case-in-chief at trial;[3]

d.      The Government has furnished to Defendant a copy of his prior criminal record, which is within its possession, custody or control, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the Government;

e.      The Government will disclose the terms of all agreements (or any other inducements) with cooperating witnesses, if any are entered into;

f.      The Government may disclose the statements of witnesses to be called in its case-in-chief when its trial memorandum is filed;[4]

g.      The Government will disclose any record of prior criminal convictions that could be used to impeach a Government witness prior to any such witness' testimony;

h.      The Government will disclose in advance of trial the general nature of other crimes, wrongs, or acts of Defendant that it intends to introduce at trial pursuant to Rule 404(b) of the

---

[2] Rule 16(a)(1)(C) authorizes defendants to examine only those Government documents material to the preparation of their defense against the Government's case-in-chief. United States v. Armstrong, 517 U.S. 456, 463 (1996). Rule 16 does not require the disclosure by the prosecution of evidence it intends to use in rebuttal. United States v. Givens, 767 F.2d 574, 583 (9th Cir. 1984).

[3] The Government need not "disclose every single piece of paper that is generated internally in conjunction with scientific tests." United States v. Iglesias, 881 F.2d 1519, 1524 (9th Cir. 1989).

[4] Production of these statements is governed by the Jencks Act and need occur only after the witness testifies on direct examination. United States v. Mills, 641 F.2d 785, 789-790 (9th Cir. 1981); United States v. Dreitzler, 577 F.2d 539, 553 (9th Cir. 1978). For Jencks Act purposes, the Government has no obligation to provide the defense with statements in the possession of a state agency. United States v. Durham, 941 F.2d 858, 861 (9th Cir. 1991). Prior trial testimony does not fall within the scope of the Jencks Act. United States v. Isigro, 974 F.2d 1091, 1095 (9th Cir. 1992). Further, an agent's recorded radio transmissions made during surveillance are not discoverable under the Jencks Act. United States v. Bobadilla-Lopez, 954 F.2d 519, 522-23 (9th Cir. 1992). The Government will provide the grand jury transcripts of witnesses who have testified before the grand jury if said testimony relates to the subject matter of their trial testimony. Finally, the Government reserves the right to withhold the statement of any particular witness it deems necessary until after the witness testifies.

1  Federal Rules of Evidence;

2          I.      The Government acknowledges and recognizes its continuing obligation to

3  disclose exculpatory evidence and discovery as required by <u>Brady v. Maryland</u>, 373 U.S. 83 (1963),

4  <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the Jencks Act and Rules 12 and 16 of the Federal Rules

5  of Criminal Procedure, and will abide by their dictates.[5]

6          **2.      <u>Items which go beyond the strictures of Rule 16</u>**

7          **a.      <u>Defendant's requests for specific Brady information or general Rule 16</u>**

8                   **<u>discovery.</u>**

9  Defendant requests that the Government disclose all evidence favorable to him, which tends to

10  exculpate him, which may be relevant to any possible defense or which "affects the credibility of the

11  Government's case." (Motion at 10.)

12          It is well-settled that prior to trial, the Government must provide a defendant in a criminal case

13  with evidence that is both favorable to the accused and material to guilt or punishment.  <u>Pennsylvania</u>

14  <u>v. Richie</u>, 480 U.S. 39, 57 (1987); <u>United States v. Agurs</u>, 427 U.S. 97 (1976); <u>Brady v. Maryland</u>, 373

15  U.S. 83, 87 (1963).   As the Supreme Court has explained, "a fair analysis of the holding in <u>Brady</u>

16  indicates that implicit in the requirement of materiality is a concern that the suppressed evidence may

17  have affected the outcome of the trial."  <u>Agurs</u>, 427 U.S. at 104.  "[E]vidence is material <u>only</u> if there

18  is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

19  proceeding would have been different."  <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985) (emphasis

20  added).  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

21  <u>Richie</u>, 480 U.S. at 57 (citation omitted).

22          The Supreme Court has repeatedly held that the <u>Brady</u> rule is not a rule of discovery; rather, it

23  is a rule of fairness and is based upon the requirement of due process.  <u>Bagley</u>, 473 U.S. at 675, n. 6.

24  The Supreme Court's analysis of the limited scope and purpose of the <u>Brady</u> rule, as set forth in the

25

26          [5] <u>Brady</u> requires the Government to produce all evidence that is material to either guilt or
    punishment.  The Government's failure to provide the information required by <u>Brady</u> is constitutional
27  error only if the information is material, that is, only if there is a reasonable probability that the result
    of the proceeding would have been different had the information been disclosed.  <u>Kyles v. Whitley</u>, 514
28  U.S. 419 (1995).  However, neither <u>Brady</u> nor Rule 16 require the Government to disclose inculpatory
    information to the defense.  <u>United States v. Arias-Villanueva</u>, 998 F.2d 1491 (9th Cir. 1993).

1    Bagley opinion, is worth quoting at length:

2         Its purpose is not to displace the adversary system as the primary means by which truth

3         is uncovered, but to ensure that a miscarriage of justice does not occur. [footnote

4         omitted].  Thus, the prosecutor is not required to deliver his entire file to defense

5         counsel, but only to disclose evidence favorable to the accused that, if suppressed, would

6         deprive the defendant of a fair trial: "For unless the omission deprived the defendant of

7         a fair trial, there was no constitutional violation requiring that the verdict be set aside;

8         and  absent a constitutional violation, there was no breach of the prosecutor's

9         constitutional duty to disclose . . . but to reiterate a critical point, the prosecutor will not

10        have violated his constitutional duty of disclosure unless his omission is of sufficient

11        significance to result in the denial of the defendant's right to a fair trial.

12
     Id. at 675 (emphasis added, citation omitted).  Accordingly, the Government in this case will comply
13
     with the Brady mandate but rejects any affirmative duty to create or seek out evidence for the defense.
14
                    b.        **Disclosure of witness information**
15
             Defendant seeks numerous records and information pertaining to potential Government
16
     witnesses.  Regarding these individuals, the Government will provide Defendant with the following
17
     items prior to any such individual's trial testimony:
18
                    (1)       The terms of all agreements (or any other inducements) it has made with
19
     cooperating witnesses, if they are entered into;
20
                    (2)       All relevant exculpatory evidence concerning the credibility or bias of
21
     Government witnesses as mandated by law; and,
22
                    (3)       Any record of prior criminal convictions that could be used to impeach
23
     a Government witness.
24
             The Government opposes disclosure of rap sheet information of any Government witness prior
25
     to trial.  See United States v. Taylor, 542 F.2d 1023, 1026 (8th Cir. 1976).  Furthermore, any uncharged
26
     prior misconduct attributable to Government witnesses, all promises made to and consideration given
27
     to witnesses by the Government, and all threats of prosecution made to witnesses by the Government
28
     will be disclosed if required by Brady and Giglio.

1          **c.      Agents' rough notes**

2          Although the Government has no objection to the preservation of agents' handwritten notes, the

3   Government objects to their production at this time.  If during any evidentiary proceeding, certain rough

4   notes become relevant, these notes will be made available.

5          Prior production of these notes is not necessary because they are not "statements" within the

6   meaning of the Jencks Act unless they comprise both a substantially verbatim narrative of a witness'

7   assertions <u>and</u> they have been approved or adopted by the witness.  <u>United States v. Spencer</u>, 618 F.2d

8   605, 606-07 (9th Cir. 1980); <u>United States v. Kaiser</u>, 660 F.2d 724, 731-32 (9th Cir. 1981); <u>United</u>

9   <u>States v. Griffin</u>, 659 F.2d 932, 936-38 (9th Cir. 1981).

10         **d.      Government reports, summaries and memoranda**

11         Rule 16 provides, in relevant part:

12         [T]his rule does not authorize the discovery or inspection of reports, memoranda, or
           other internal government documents made by the attorney for the government or <u>other</u>
13         <u>government agent in connection with the investigating or prosecuting of the case</u>.

14   Rule 16(a)(2).  This subsection exempts from disclosure documents prepared by government attorneys

15   and agents that would otherwise be discoverable under Rule 16.  <u>United States v. Fort</u>, 472 F.3d 1106,

16   1110 & n.2 (9th Cir. 2007).

17         As expressed previously, the Government recognizes its obligations pursuant to <u>Brady</u>, <u>Giglio</u>,

18   Rule 16, and the Jencks Act.[6]  But the Government shall not turn over internal memoranda or reports

19   which are properly regarded as work product exempted from pretrial disclosure.[7]  Such disclosure is

20   supported neither by the Rules of Evidence nor case law and could compromise other areas of

21   investigation still being pursued.

22         **e.      Addresses and phone numbers of Government witnesses**

23         Defendant requests the name and last known address and phone of each prospective Government

24   witness.  While the Government <u>may</u> supply a tentative witness list with its trial memorandum, it objects

25   to providing home addresses and telephone numbers.  <u>See</u> <u>United States v. Sukumolachan</u>, 610 F.2d 685,

26

27          [6] Summaries of witness interviews conducted by Government agents are not Jencks Act
     statements.  <u>United States v. Claiborne</u>, 765 F.2d 784, 801 (9th Cir. 1985).

28          [7] The Government recognizes that the possibility remains that some of these documents may
     become discoverable during the course of the trial if they are material to any issue that is raised.

688 (9th Cir. 1980); United States v. Conder, 423 F.2d 904, 910 (9th Cir. 1970) (addressing defendant's request for the addresses of actual Government witnesses).  A request for the home addresses and telephone numbers of Government witnesses is tantamount to a request for a witness list and, in a non-capital case, there is no legal requirement that the Government supply defendant with a list of the nonexpert witnesses it expects to call at trial.  United States v. W.R. Grace, 493 F.3d 1119, 1128 (9th Cir. 2007).

**f.        Personnel files of federal agents**

Pursuant to United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991), and United States v. Cadet, 727 F.2d 1453 (9th Cir. 1984), the Government agrees to review the personnel files of its federal law enforcement witnesses and to "disclose information favorable to the defense that meets the appropriate standard of materiality . . . ."  Cadet, 727 F.2d at 1467-68.  Further, if counsel for the United States is uncertain about the materiality of the information within its possession, the material will be submitted to the court for in-camera inspection and review.  In this case, the Government will ask the affected law enforcement agency to conduct the reviews and report their findings to the prosecutor assigned to the case.

In United States v. Jennings, 960 F.2d 1488 (9th Cir. 1992), the Ninth Circuit held that the Assistant U.S. Attorney assigned to the prosecution of the case has no duty to personally review the personnel files of federal law enforcement witnesses.  In Jennings, the Ninth Circuit found that the present Department of Justice procedures providing for a review of federal law enforcement witness personnel files by the agency maintaining them is sufficient compliance with Henthorn.  Id.  In this case, the Government will comply with the procedures as set forth in Jennings.

Finally, the Government has no duty to examine the personnel files of state and local officers because they are not within the possession, custody or control of the Federal Government.  United States v. Dominguez-Villa, 954 F.2d 562 (9th Cir. 1992).

**g.        Reports of witness interviews**

To date, the Government does not have any reports regarding witness interviews or otherwise that have not been turned over to Defendant.  However, to the extent that such additional reports regarding witness interviews are generated, the information sought by Defendant is not subject to

1   discovery under the Jencks Act, 18 U.S.C. § 3500.

2       Reports generated in connection with a witness's interview session are only subject to production

3   under the Jencks Act if the witness signed the report or otherwise adopted or approved the contents of

4   the report. See 18 U.S.C. § 3500(e)(1); United States v. Miller, 771 F.2d 1219, 1231-31 (9th Cir. 1985)

5   ("The Jencks Act is, by its terms, applicable only to writings which are signed or adopted by a witness

6   and to accounts which are substantially verbatim recitals of a witness' oral statements."); United States

7   v. Friedman, 593 F.2d 109, 120 (9th Cir. 1979) (interview report containing a summary of a witness'

8   statements is not subject to discovery under the Jencks Act); United States v. Augenblick, 393 U.S. 248,

9   354 (1969) (rough notes of witness interview not a "statement" covering entire interview). Indeed,

10  "both the history of the [Jencks Act] and the decisions interpreting it have stressed that for production

11  to be required, the material should not only reflect the witness' own words, but should also be in the

12  nature of a complete recital that eliminates the possibility of portions being selected out of context."

13  United States v. Bobadilla-Lopez, 954 F.2d 519, 522 (9th Cir. 1992).

14              **h.    Expert witnesses**

15      The Government will disclose to Defendant the name, qualifications, and a written summary of

16  testimony of any expert the Government intends to use during its case-in-chief at trial pursuant to Fed.

17  R. Evid. 702, 703, or 705 three weeks prior to the scheduled trial date.

18              **I.    Other discovery requests**

19      To the extent that the above does not answer all of Defendant's discovery requests, the

20  Government opposes the motion on the grounds that there is no authority requiring the production of

21  such material.

22                          **V**

23              **MOTION FOR A-FILE VIEWING**

24      Defendant seeks a Court order allowing defense counsel to view defendant's A-File. The

25  basis for the request is defendant's speculation that the A-File may contain "evidence favorable to

26  the defendant on the issue of guilt." (Motion at 14.)

27  / / /

28  / / /

1    The doctrine of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), emanates from due process

2 concerns, and <u>Brady</u> created no general rule of discovery allowing criminal defendant's unfettered

3 access to government files.  As the Supreme Court explained in <u>United States v. Bagley</u>, 473 U.S.

4 667 (1985):

5    [<u>Brady</u>'s] purpose is not to displace the adversary system as the primary means by

6    which truth is uncovered, but to ensure that a miscarriage of justice does not occur.

7    [footnote omitted].  Thus, <u>the prosecutor is not required to deliver his entire file to</u>

8    <u>defense counsel</u>, but only to disclose evidence favorable to the accused that, if

9    suppressed, would deprive the defendant of a fair trial . . .

10 <u>Id</u>. at 675 (emphasis added).

11    Evidence is material under <u>Brady</u> and must be disclosed "only if there is a reasonable

12 probability that, had the evidence been disclosed to the defense, the result of the proceeding would

13 have been different."  <u>Id</u>. at 682.  The Supreme Court repeatedly has recognized that the duty to

14 ascertain the collective materiality of any exculpatory evidence rests with the Government:

15    [T]he prosecution, which alone can know what is undisclosed, must be assigned the

16    consequent responsibility to gauge the likely net effect of all such evidence and make

17    disclosure when the point of "reasonable probability" is reached.

18 <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995); <u>United States v. Nagra</u>, 147 F.3d 875, 881 (9th Cir. 1998)

19 ("Under <u>Brady</u>, the government must disclose before trial evidence that is material  either to guilt or

20 punishment which is favorable to the accused . . .") (emphasis in original, citation omitted).

21    Even where a defendant makes a showing that material exculpatory information may not

22 have been disclosed, the remedy is not to provide the information to the Defendant, but rather for the

23 Court to conduct an <u>in camera</u> review.  Absent a showing of materiality, however, "the district court

24 need not conduct an <u>in camera</u> review of the government's files for <u>Brady</u> evidence favorable to the

25 accused."  <u>United States v. Alvarez</u>, 358 F.3d 1194, 1211 (9th Cir. 2004); <u>United States v. Henke</u>,

26 222 F.3d 633, 642-43 (9th Cir. 2000) (holding district court had no obligation to conduct <u>in camera</u>

27 review of agent's notes where "defendants made no showing that they might discover something

28 exculpatory or impeaching").

1    Here, Defendant has made no showing of materiality of documents in his A-File, and there is

2    no basis for an <u>in camera</u> inspection, much less an order directing the Government to allow

3    Defendant to view the A-file.  The Government will review the A-File and produce to Defendant any

4    material exculpatory information contained therein.

5    **VI**

6    **<u>CONCLUSION</u>**

7    For the foregoing reasons, the Government respectfully requests that the Court deny

8    Defendant's  motions.

9

10    DATED: March 17, 2008.                    Respectfully submitted,

11                                              Karen P. Hewitt
                                                United States Attorney

12
                                                s/ David D. Leshner
13                                              DAVID D. LESHNER
                                                Assistant U.S. Attorney

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

08CR0401-H

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,     )     Case No. 08-CR-0401-H
                  )
        Plaintiff,     )
                  )
        v.     )
                  )     CERTIFICATE OF SERVICE
LUIS ENRIQUE CRUZ-VALLES,     )
                  )
        Defendant.     )
_____)

IT IS HEREBY CERTIFIED THAT:

I, DAVID D. LESHNER, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of **UNITED STATES' RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS TO: (1) DISMISS THE INDICTMENT; (2) COMPEL DISCOVERY; AND (3) ORDER AN A-FILE VIEWING** on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Robert Henssler, Esq.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 17, 2008.


               /s/ David D. Leshner
               DAVID D. LESHNER

08CR0401-H