1                 UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF CALIFORNIA

3

4  UNITED STATES OF AMERICA,        )  Case No. 08CR0401-H
                                    )
5            Plaintiff,             )  San Diego, California
                                    )
6  vs.                              )  Tuesday,
                                    )  May 27, 2008
7  LUIS ENRIQUE CRUZ-VALLES,        )  2:00 p.m.
                                    )
8            Defendant.             )
   _____ )

9

10          TRANSCRIPT OF MOTION HEARING/TRIAL SETTING
              BEFORE THE HONORABLE MARILYN L. HUFF
11                UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiff:             DAVID D. LESHNER, ESQ.
                                   Assistant United States
14                                  Attorney
                                   880 Front Street
15                                 San Diego, California  92101

16  For the Defendant:             FEDERAL DEFENDERS OF SAN DIEGO
                                   BY:  ROBERT R. HENSSLER, ESQ.
17                                 225 Broadway, Suite 900
                                   San Diego, California  92101
18                                 (619) 234-8467

19  Transcript Ordered by:         DAVID D. LESHNER, ESQ.

20  Court Recorder:                Nancy Cablay
                                   United States District Court
21                                 940 Front Street
                                   San Diego, California  92101

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

*Echo Reporting, Inc.*

ii

1   Transcriber:                    Shonna D. Mowrer
                                    Echo Reporting, Inc.
2                                   6336 Greenwich Drive
                                    Suite B
3                                   San Diego, California   92122
                                    (858) 453-7590
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1    SAN DIEGO, CALIFORNIA  TUESDAY, MAY 27, 2008  2:00 P.M.

2                          --oOo--

3        (Call to order of the Court.)

4            THE CLERK:  Sixteen on calendar, 08CR401, Number

5    16, USA versus Luis Enrique Cruz-Valles for motion hearing/

6    trial setting.

7            MR. HENSSLER:  Good afternoon, your Honor.  Bobby

8    Henssler from Federal Defenders for Mr. Cruz-Valles.

9            MR. LESHNER:  Good afternoon, your Honor.  David

10   Leshner for the United States.

11           THE COURT:  Good afternoon.

12           MR. HENSSLER:  Your Honor, Mr. Cruz-Valles is now

13   present before the Court.

14           THE COURT:  Thank you.

15           MR. HENSSLER:  And we're ready to proceed.

16           THE COURT:  This is -- this is one of those tough

17   legal issues where the Court had reviewed the briefs before

18   and then let the Government do a supplemental brief about

19   whether under the law the Defendant qualifies for derivative

20   citizenship or not.  And so I am assuming that the parties

21   would get clarification maybe eventually through the

22   appellate process, if necessary, on this issue.

23           The Government, after being requested by the Court

24   to do supplemental briefing, has done that, and Defendant's

25   derivative citizenship claim in its brief filed May 7th,

2

1  2008 indicates three legal issues, whether at the time of

2  Defendant's birth, Title 8, United States Code Section

3  1409(a), which applies to a child born out of wedlock to a

4  U.S. citizen father and alien mother required a blood

5  relationship between the child and the U.S. citizen father;

6  two, whether Defendant was legitimated under California

7  Civil Code 230, the statute in effect at the time of his

8  birth, in the absence of a blood relationship with his

9  claimed U.S. citizen father, and three, whether Defendant

10 was legitimated under Mexican law.

11         The Government contends that the absence of a

12 biological relationship between Defendant and the U.S.

13 citizen father he claims is dispositive of each of those

14 issues because, absent a blood relationship, the Government

15 contends that Defendant is statutorily ineligible for

16 citizenship under Title 8, United States Code Section

17 1409(a).

18         And then even assuming that 1409(a) in effect at

19 the time of Defendant's birth did not require a blood

20 relationship, the law of both California and Mexico

21 pertained to legitimation, in fact, required a blood

22 relationship.  And Defendant contends that neither 1409(a)

23 nor California or Mexican law pertaining to legitimation

24 required a blood relationship.

25         And so the Government has now filed an additional

3

1  document, and the Defense then has done a response to the

2  Government's filing of the legislative history document.  So

3  I'd like argument on that.  Would you like to then respond

4  to the Government's submission?

5           MR. HENSSLER:  Sure.  Thank you, your Honor.  And,

6  you know, you accurately summarize where we stand.  We were

7  last in front of you on April 7th, and I believe you stated

8  that it was your intention to grant the motion that you

9  felt --

10          THE COURT:  The Court's tentative was at that time

11 in your favor, and since then the Government has done a good

12 job in filing its brief, and so now we're back to I'd like

13 to hear from the parties.

14          MR. HENSSLER:  So the Government submitted -- I

15 guess it's a legal -- like a law school textbook, a section

16 of it from -- Mexican law school textbook relating to the

17 Mexican Civil Code section at issue.  In response, I

18 submitted an expert declaration from Ilia Esta Flores, who

19 is -- who works for the Civil Registry in Mexico.  And that

20 filing, for your Honor's information, is dated May 13th.

21          And Ms. Flores, you know, she did a couple of

22 things which I think the Court will find helpful in reaching

23 its conclusion.  First she did investigate the birth

24 certificate from Mr. Cruz-Valles and determined that it was

25 a valid legitimate birth certificate in Mexico.

4

1          THE COURT:  And done before -- and done well

2    before there was any issue.  It wasn't done for the purpose

3    of litigation here in this -- it was done many years ago.

4          MR. HENSSLER:  Exactly.  It was done in 1979.  She

5    was able to go and check the logs in Mexico and determine

6    that it was done then, it was properly done, and that Jose

7    Cruz, Mr. Cruz-Valles' father, who I will note for the Court

8    is present before the Court -- he's in the green shirt, and

9    that's his mother in the red shirt.  So that's the first

10   thing that the expert did.

11         The second thing she did is looked at the Mexican

12   Civil Code, which she deals with every day -- this is what

13   she does, has done for over 10 years.  And she said that

14   Jose Cruz, when he stated he was Mr. Cruz-Valles' father on

15   the birth certificate, the Mexican birth certificate, was

16   voluntarily recognizing Mr. Cruz-Valles as his son and that

17   under Mexican law, this voluntary recognition had the effect

18   of establishing his paternity and relationship to Mr. Cruz-

19   Valles.

20         In conclusion, she states that under Mexican law,

21   Jose Cruz is the Defendant, Mr. Cruz-Valles' father.  And I

22   think that therefore, under the Mexican Civil Code section

23   at issue, that legitimation under Mexican law is satisfied.

24   There is no blood requirement.  Ms. Flores, the expert, was

25   aware that Mr. Cruz-Valles is not the biological child of

5

1 Mr. Cruz.  So that's the supplemental briefing that the

2 Defense filed.

3            And I think the easiest way to look at this, your

4 Honor, is to kind of take a step back.  As you know, in a

5 1326(d) motion, once the Defendant like Mr. Cruz-Valles

6 makes a prima facie showing of prejudice, the burden shifts

7 to the Government, and the Government has to demonstrate

8 that the procedural violation could not have changed the

9 procedural outcome at Mr. Cruz-Valles, the Defendant's

10 deportation proceeding.

11            So the burden is with the prosecutor here.  And

12 they --

13            THE COURT:  I'm not really deciding truly whether

14 he is or he isn't.  It's whether there was a valid good-

15 faith issue that should have been raised before.  Is that

16 the issue that you're presenting?

17            MR. HENSSLER:  That, I think, is even an easier

18 way for the Court to look at it.  You don't even have to

19 really reach the ultimate issue.  You could just say it

20 looks like there is a prima facie showing.  The prosecutor

21 hasn't met his burden to overcome that showing and grant the

22 1326(d) motion that way.

23            THE COURT:  How does that help you?  Does he then

24 go into administrative proceedings and then in the -- before

25 the immigration authorities revisit the matter and raises if

6

1  they attempt to deport him, whether or not he can make a

2  showing or does he go into legal limbo?

3          MR. HENSSLER:  Well, it helps us quite a bit, your

4  Honor.  Mr. Cruz-Valles is looking at a significant exposure

5  because he does have a prior which would constitute a plus

6  16.  So even though he has a limited criminal history, what

7  granting the motion would do is take it out of the criminal

8  context.  Yes, he would then go into immigration custody,

9  and he would just be -- you know, become a U.S. citizen at

10 that point.  He would then pursue citizenship and try to

11 establish his citizenship with an immigration judge.  But it

12 would be taken out of a criminal context.

13          If he couldn't establish that with an immigration

14 judge, he could still be deported, but for our purposes, I

15 think that's sort of a side issue.

16          THE COURT:  Now, what do you say to the

17 Government's point?  They say I don't get to the

18 legitimation under Mexican law at all.  1409 requires the

19 blood relationship.  And since there is no blood

20 relationship -- and they cite a couple of cases before,

21 which were before the Court.  In <u>Scales vs. INS</u>, 232 F.3d

22 1159, Ninth Circuit 2000, they said that the Court of

23 Appeals said the INA does expressly require a blood

24 relationship between a person claiming citizenship and a

25 citizen father if the person is born out of wedlock.

7

1        MR. HENSSLER:  Well, your Honor, the first thing I

2   would say is, that case does not address the section at

3   issue for the -- the section that would have been in effect

4   at the time at issue when Mr. Cruz-Valles was legitimated by

5   his U.S. citizen father.  So I think the case is really not

6   on point.

7        THE COURT:  The legitimation was in 1979 and then

8   Scales was talking about a petitioner born in 1977.  Is that

9   close enough or not?

10       MR. HENSSLER:  I don't have a copy of that opinion

11  in front of me, your Honor, but I know I responded to the

12  Government's citation to Scales in the reply brief that was

13  filed on March 28th, and it's my recollection that the

14  Scales opinion does not address the version that we're

15  talking about here, the version of 1409.

16       THE COURT:  All right.

17       MR. HENSSLER:  And I guess -- I'm sorry.

18       THE COURT:  Go ahead.

19       MR. HENSSLER:  You know, and what I would say in

20  addition to that is that -- what we said before and what we

21  said in the papers is that the Supreme Court has repeatedly

22  held that the deliberate selection of language different

23  from that used in an earlier act can indicate that a change

24  of law was intended.

25       The new version that went into effect afterwards

8

1  did explicitly require a blood relationship.  The old

2  version doesn't indicate whether it does or not, whether it

3  does or not require a blood relationship.  And I think that

4  is helpful for the Court to consider in whether the older

5  version of INA Section 309 that existed at the time of Mr.

6  Cruz-Valles' legitimation, what it really means.

7          THE COURT:  Thank you.  Anything further from the

8  Defense side?

9          MR. HENSSLER:  Not at this moment, your Honor.

10         THE COURT:  Let me hear from the Government.

11         MR. LESHNER:  Thank you, your Honor.  I would

12 limit my comments, unless the Court has additional

13 questions, which I of course will be happy to try to answer,

14 starting with the -- what Mr. Henssler just finished

15 speaking about, which is the issue of the Immigration and

16 Nationality Act, and specifically Section 1409.  Because it

17 is and has been the Government's position that the Court

18 does not need to delve into the vagaries of California and

19 certainly not Mexican law to resolve this case.

20         In the context of a 1326(d) motion, there is of

21 course a requirement that the Defendant show prejudice.  And

22 I believe Mr. Henssler accurately stated the standard that

23 there needs to be on his end a prima facie case, and then

24 the Government must make a showing.  In the posture of this

25 case, we are talking about a pure issue of law.

9

1        THE COURT:  Are we?  That's the interesting thing

2  to the Court.  If I'm struggling so much with this, going

3  back and forth on the law, then should it at least have been

4  raised to the Immigration Court who could equally take a

5  look at it?

6        MR. LESHNER:  I would submit that the answer is no

7  on the prejudice prong, your Honor.  And here is why.

8  Irrespective of whether this may be a legal issue that

9  requires a few steps or is a tricky issue, the fact is it is

10  a pure issue of law because the essential facts are

11  undisputed.  That is that Mr. Cruz-Valles was born in Mexico

12  out of wedlock and that his natural parents are Mexican

13  citizens.

14        It is undisputed, at least for purposes of this

15  motion, that Mr. Cruz, the claimed father -- and I will use

16  that reference just because I think it's easier -- is not

17  Mr. Cruz-Valles' natural father, and he did sign onto his

18  birth certificate when Mr. Cruz-Valles was approximately

19  four years old.

20        That's the universe of facts that's relevant to

21  this motion.  They are all, for purposes of the motion,

22  undisputed.  And it really is a pure issue of law such that

23  defined that -- you know, a plausible ground for relief, it

24  really -- it turns on resolution of that issue whether 8 USC

25  Section 1409 has always required a blood relationship.

10

1          THE COURT:  And so his conviction that makes it an

2   aggravated felony is not waivable; is that right?  There's

3   no discretion by the Immigration?

4          MR. LESHNER:  Your Honor --

5          THE COURT:  Because that's the sub-issue.

6          MR. HENSSLER:  Well, if he's a U.S. citizen, he's

7   a U.S. citizen.

8          THE COURT:  Oh, I know that, but --

9          MR. LESHNER:  Right.  No.

10         THE COURT:  So --

11         MR. LESHNER:  I understand --

12         THE COURT:  -- assume that -- this is on the issue

13  of prejudice.  What the Government is saying -- and I

14  understand it -- they say, well, it requires a blood

15  relationship.  There is no blood relationship.  Even though

16  the father adopted him let's say at the age of four, he's

17  still not the biological father.  Therefore, there can't be

18  derivative citizen.  I'm going back to at the immigration

19  hearing, is there any -- so on the issue of prejudice, one,

20  we have to resolve whether the Government is right or not

21  right or whether the Defense has an argument there.

22         But then secondly, what was his conviction -- is

23  there any discretion for the Immigration Court to then take

24  all of these facts into consideration nonetheless.  So what

25  was his conviction for?

11

1          MR. HENSSLER:  The conviction was for a 1324.

2          MR. LESHNER:  In addition to -- I haven't looked

3    at this recently, so please correct me if I'm wrong.  I

4    believe there was also -- I don't remember at this time if

5    it was a misdemeanor or felony for a domestic violence, a

6    spousal battery conviction.

7          To be honest, your Honor, I have not -- since this

8    issue was not raised in the motion, I would be loathe to

9    attempt to give you a categorical answer on what might have

10   transpired at the -- at the deportation hearing.  The answer

11   right now is I'm not sure.  If it matters to the Court --

12         MR. HENSSLER:  Well, I listened to the deportation

13   tape with respect to Mr. Cruz-Valles, and nothing was

14   raised.  It was very, you know, formulaic, and it was just

15   as they do with these groups of people that they do at a

16   time.  There was no specific discussion regarding anything

17   to Mr. Cruz-Valles.

18         THE COURT:  But let's say -- so he had this felony

19   conviction.  Is it an aggravated felony or not an aggravated

20   felony?

21         MR. LESHNER:  It is an aggravated felony, your

22   Honor.  I believe that is correct.

23         THE COURT:  For a 1324, bringing in aliens?

24         MR. HENSSLER:  Right.

25         MR. LESHNER:  It was either bringing in or

12

1  transportation.  I don't remember which at this point.

2          THE COURT:  Is it necessarily an aggravated felony

3  for which there's no relief from deportation?

4          MR. HENSSLER:  Well, if you're a U.S. citizen --

5          THE COURT:  I know on that issue, but let's -- so

6  let's -- what I'm saying is, let's say whether -- let's say

7  it goes to the Immigration and they say, well, no, really

8  Judge Gonzalez is correct.  It requires a blood

9  relationship.  The Scales, not quite on point, but similar.

10 The Ninth Circuit said blood relationship.  He doesn't have

11 a blood relationship.  Therefore, he doesn't meet it on that

12 ground, but nevertheless, had I known all of this

13 information, well, then maybe I would grant him some relief.

14         MR. HENSSLER:  Okay.  I understand what your Honor

15 is asking.  And I have to say, to be honest, I haven't

16 looked at the issue in the way that your Honor is framing

17 it.

18         THE COURT:  All right.  Let me have the Government

19 continue.

20         MR. LESHNER:  Thank you, your Honor.

21         Moving beyond our position that this is a pure

22 issue of law, the question that we did argue at length in

23 our last hearing in April is whether this blood relationship

24 requirement has existed in Section 1409 in the pre-1986 and

25 post-1986 amendments.

13

1        And it is certainly not my intention to raise

2    every point that I did beforehand.  You were very generous

3    in giving me time to argue.  With the Court's permission, I

4    would just like to hit on some highlights of that and why we

5    do strenuously --

6        THE COURT:  You may.

7        MR. LESHNER:  -- believe that the -- our

8    interpretation is correct.

9        Is it true that in the pre-1986 version of Section

10   1408, the magic words "blood relationship" do not appear in

11   that.  But it is also critical to look at the statute as

12   amended.  Because the Defense position is really, well, the

13   fact that the words "blood relationship" are in the statute

14   post-1986 must mean, of course, that pre-1986 there wasn't a

15   requirement.

16       There was even a statement in the Defendant's

17   motion that, well, Congress must have realized they had this

18   loophole and they sought to close it.  And the cases that we

19   cited from the Supreme Court from the Ninth Circuit, the

20   other District Court decision out of this district as well

21   as the legislative history really belied that interpretation

22   of Section 1409.

23       Starting with the Supreme Court's decision, the

24   two cases that are really critical here are Miller vs.

25   Albright which is from 1988 and also Nguyen vs. INS from

14

1   2001.

2           THE COURT:  I think it might be pronounced Nguyen.

3           MR. LESHNER:  Nguyen.  Excuse me.  You're

4   absolutely right.  I think you are right with the spelling

5   as I recall it now.  Yes, you're absolutely right.

6           THE COURT:  Even though it's spelled the way that

7   you were saying it.

8           MR. LESHNER:  No.  It is a Vietnamese -- you're

9   right.  It is Nguyen.  And the issue there, which is true,

10  was the post-1986 version of Section 1409.  But two things

11  are important.  First, Justice Stevens' plurality opinion

12  discusses the pre-1986 version and contrasts it with the

13  post-1986 version.  And as we pointed out in our briefing,

14  prior to 1952, he says, Section 1408 required only that the

15  paternity of a child born out of wedlock be established by

16  legitimation.  And I quote, "The section offered no other

17  means of proving a biological relationship."

18          What happened in 1986 is Congress added two other

19  ways that a United States citizen father could more or less

20  establish a paternity relationship beyond legitimation.

21  They were by voluntarily recognizing it and through a court

22  order.  And that is now 1409(a)(4).

23          The blood relationship language is in 1409(a)(1).

24  And Justice Stevens said about 1409(a)(4), which includes

25  legitimation, the substantive requirement of legitimation

15

1  serves to ensure that a person born out of wedlock who

2  claims citizenship by birth actually shares a blood

3  relationship with an American citizen.

4         And the import of that is as follows.  Justice

5  Stevens recognizes that the requirement of the biological

6  relationship has always existed, both in the version of pre-

7  1986, which refers only to legitimation and also to post-

8  1986, Subsection (a)(4), which provides a couple of other

9  mechanisms for -- in addition to legitimation, voluntary

10 recognition or court order, and that the blood relationship

11 requirement that the Defense is relying entirely on which is

12 now Subsection (a)(1), Justice Stevens says that standard of

13 proof is merely an ancillary measure.  It's not replacement

14 for proof of paternity by legitimation or formal

15 alternative.

16        The reasoning was this.  It's a heck of a lot

17 easier to simply voluntarily recognize someone than to

18 legitimate them.  And what Congress was simply saying is,

19 because we're making it a little bit easier, in effect,

20 we're going to impose a standard of proof by clear and

21 convincing evidence.

22        Justice Kennedy's opinion in <u>Wynn vs. INS</u>

23 (phonetic) really recognizes the same thing.  And this is

24 from 2001, and this is an opinion for the Court, it's not a

25 plurality opinion, where the opinion states:

16

1         "The first governmental interest to

2         be served by Section 1409(a)(4) which

3         includes the legitimation requirement,

4         not blood relationship language, the

5         first governmental interest is the

6         importance of assuring that a biological

7         parent/child relationship exists."

8         And the importance of this passage from Wynn is

9    that it is the legitimation provisions that speak to the

10   biological parent/child relationship.  This blood

11   relationship language was simply to provide this clear and

12   convincing standard of proof.  It was never seen as a formal

13   new requirement that didn't exist before.

14        And the Ninth Circuit's decision in Scales that

15   the Court references and in Solis-Espinosa, although it is

16   true they do not deal with this precise issue, are very --

17   are very much on point in that -- you specifically inquired

18   about Scales.  In that case, the petitioner was born in

19   1977, meaning when the pre-1986 version of the statute was

20   in effect.  And this is our brief at page seven.  And the

21   Ninth Circuit recognized that the INA does require a blood

22   relationship to establish citizenship where a person is born

23   out of wedlock.

24        In that case, the court was able to get around the

25   issue because the court concluded that the petitioner in

17

1 that case was born in wedlock.  So that blood relationship

2 requirement didn't apply.  But again, under the undisputed

3 facts of this case, Mr. Cruz-Valles was born out of wedlock,

4 and the blood relationship requirement does apply.

5        And the same really was true in the Ninth Circuit

6 decision in <u>Solis-Espinosa vs. Gonzalez</u> from 2005.  The

7 Ninth Circuit again recognized the existence of a blood

8 relationship requirement for someone born in 1967 when the

9 pre-1986 version of Section 1409 was in effect but said,

10 under this case, the parents were married at the time of the

11 birth, so that blood relationship requirement doesn't apply.

12        Those two petitioners were equally situated to Mr.

13 Cruz-Valles here.  And in each of those cases, the Ninth

14 Circuit would have applied the blood relationship

15 requirement but for the fact that the defendant was not --

16 was born in wedlock, I should say.  In this case, again,

17 it's undisputed that Mr. Cruz-Valles was born out of

18 wedlock.

19        THE COURT:  Can I ask, if the Court did grant the

20 Defendant's motion to dismiss on the prejudice issue --

21        MR. LESHNER:  Yes, your Honor.

22        THE COURT:  -- then does the Government have a

23 right of appeal?

24        MR. LESHNER:  I believe so, your Honor, yes.

25        THE COURT:  And so you could appeal the issue.

18

1  Meanwhile, he'll go into immigration custody if I simply

2  rule that he -- that he's made a prima facie showing of

3  prejudice and the Government hasn't rebutted the prima facie

4  showing of prejudice?

5           MR. LESHNER:  Assuming --

6           THE COURT:  I'm saying if if if.

7           MR. LESHNER:  We'd be disappointed in that ruling,

8  yes, but assuming that that would be the Court's ruling, I

9  believe, yes, the Government does have a right to appeal.

10 With respect to the specific question you asked about

11 whether he would go into immigration custody immediately and

12 begin those proceedings during the pendency of the appeal,

13 I'm not sure of the answer to that.  I don't know if those

14 proceedings would go forward while an appeal -- any appeal

15 from an adverse ruling is pending.  I just don't know.

16          I mean, what's I think also important too, if the

17 Court is wondering what could happen here, is Mr. Cruz-

18 Valles has always had the ability to file a derivative

19 citizenship application.  From the moment this issue was

20 raised months ago, he could have done it.

21          And it's really not -- I'm not saying that because

22 it makes us win this motion, but to the extent the Court is

23 wondering what remedies he might have, he hasn't done it.  I

24 have no idea why.  I don't think it matters for purposes of

25 this motion, but that's an option that has been available to

19

 1  him from the outset, and he's elected not to avail himself
 2  of it.
 3          THE COURT:  Anything else from the Government?
 4          MR. LESHNER:  I will conclude by saying only this,
 5  your Honor.  I won't go through it all again.  If the Court
 6  were to adopt the Defendant's argument that that there
 7  was -- Congress recognized in 1986 that there was some
 8  loophole and that under the law as it existed, which is
 9  Defendant's interpretation, any male in Mexico could walk
10  into a registrar's office, say, this is my son, sign a birth
11  certificate, and if that man was a United States citizen,
12  that child would then automatically become a United States
13  citizen.  That's the proposition that the Defense is
14  advancing in this case.
15          If Congress had recognized that the floodgates
16  were opened to this type of situation, surely somewhere
17  there would be some hint of that in the legislative history.
18  And as the Court is aware from the documents we filed in
19  support of both the 1952 Section 1409 and the 1986
20  amendments, that's just simply not the case.
21          The whole point of 1986 was not to fix the
22  loophole.  It was to actually make it a little bit easier
23  for fathers not to have to go through the process of
24  establishing legitimation.  They could just voluntarily
25  recognize somebody.

20

1        But as the legislative history states, the burden

2   of proof to establish a blood relationship remains -- not as

3   imposed on.  It remains as it always has on the father to

4   establish paternity by this time now just by clear and

5   convincing evidence.  And so we do believe the legislative

6   history supports our position that our interpretation of the

7   statute is correct.

8        Unless the Court has further questions, you've

9   given me ample time to argue, and I appreciate it, and I

10  would submit on that basis.

11       THE COURT:  Thank you.

12       Response from the Defense.

13       MR. HENSSLER:  Thank you, your Honor.  The first

14  thing I would like to respond to is Mr. Leshner's I guess

15  suggestion that the proposition that you would be ruling on

16  if you granted this 1326(d) motion is that any Mexican

17  citizen could, I guess, have a U.S. citizen go down to

18  Mexico, go to the registrar and sign himself as the Mexican

19  citizen's father, would then become a United States citizen.

20       I mean, that's certainly not what we're arguing,

21  and that's certainly not what a granting of this motion

22  would hold.  As your Honor has noted, this birth certificate

23  is from 1979.  It's a valid, legitimate birth certificate.

24  The Government doesn't contest that.

25       In addition to that, I submitted an expert

21

1  declaration stating that.  Obviously, any judge -- if this

2  birth certificate was dated after his arrest or in recent --

3  recent time, you know, it would raise a red flag.

4          You know, I think getting back to what I said

5  before, I'm not going to restate everything, but I really

6  think the easiest way for the Court to decide this issue is

7  to say that there has been a prima facie showing and that

8  the Government hasn't overcome their burden.  You know, the

9  Court doesn't necessarily have to, you know, reach the

10 ultimate issue.

11         And even if the Court does, what the Government is

12 suggesting, this -- I hate to use this phrase, but the

13 parade of horribles, it's just not -- it's not an issue.

14         Unless your Honor has any other questions, I'll

15 submit.

16         THE COURT:  Thank you.

17         Let me just ask the Government, what about the

18 issue of prejudice?  What would you show -- what would you

19 say in response to the Court's question about whether you

20 can rebut the issue of prejudice?  You're just saying it

21 wouldn't make any bit of difference because he needs a

22 biological relationship?

23         MR. LESHNER:  I would say that there has not, in

24 fact, been a prima facie showing of prejudice in the first

25 instance.  And simply because the showing of prejudice for

22

1  the prima facie case is entirely based on the notion that

2  Mr. Cruz-Valles could be a derivative citizen in the first

3  place.  And that is entirely based on this interpretation of

4  Section 1409.

5          So our position would be that there has not been a

6  prima facie showing of prejudice based on what -- and I hate

7  to keep repeating myself -- a pure issue of law.

8          THE COURT:  All right.  Thank you.  The matter is

9  submitted.  I appreciate the excellent briefing by both

10 sides on this issue.  The motion before the Court is a

11 motion to dismiss the indictment on the grounds that the

12 deportation was invalid because the facts and circumstances

13 were not adequately presented to the immigration judge, and

14 the immigration judge did not fully articulate all of the

15 plausible grounds for relief to the Defendant at the time of

16 the deportation.

17         The Government argues that he cannot show

18 prejudice because it is a pure issue of law whether the

19 Defendant qualifies for derivative citizenship because it is

20 undisputed that the U.S. citizen father is not the

21 biological father of the Defendant.  So the Government says

22 end of story.

23         The Defense says no one -- on the legislative

24 history, there is a dispute because the version in existence

25 at the time that would pertain to the Defendant did not

23

1   contain the words "biological father."  And the amended
2   version then changed the language, so on legislative history
3   analysis, one would presume that the earlier version
4   permitted a blood relationship because there is an absence
5   of language.
6          The Government responds, saying, no, it always was
7   in existence, that the blood relationship was always a
8   requirement.  And there's case law, including <u>Miller vs.</u>
9   <u>Albright</u>, 523 U.S. 420 at 436, while not directly directly
10  on point, certainly leads one to that conclusion.  And other
11  cases as well, including a case within our district by Judge
12  Gonzalez, <u>United States vs. Margut Palado</u> (phonetic), 27
13  West Law, 2070, 348, Southern District of California, July
14  16, 2007.
15         In that case, the Defendant was born in Mexico in
16  1968.  Both his natural parents were Mexican citizens.  The
17  Defendant's mother subsequently entered into a relationship
18  with another man who held the Defendant out to be his son,
19  and the nonbiological father was named as the Defendant's
20  father on a Mexican birth certificate filed almost five
21  years after the Defendant's birth.
22         The District Court rejected the Defendant's
23  argument that the pre-1986 version of 1409(a) did not
24  require a blood relationship of the claimed U.S. citizen
25  parent.  Relying primarily on Justice Stevens' plurality

24

1  opinion in <u>Miller vs. Albright</u>, the District Court reasoned

2  the discussion in <u>Miller</u> makes clear the pre-1986 version of

3  the statute focused on proving a biological relationship and

4  explicitly had placed paternity with biological

5  relationship.

6         The Court finds the 1986 amendments to the INA did

7  not change the under-meaning -- underlying meaning of

8  paternity which is synonymous with biological relationship.

9  And the Court concluded where defendant indisputably lacks a

10  biological relationship with Ms. Margut, defendant's

11  argument for derivative citizenship contravenes the purpose

12  and intent of 1409(a), concluding that the absence of a

13  blood relationship rendered the defendant ineligible for a

14  derivative citizenship.  The District Court denied the

15  motion to dismiss the indictment under 1326(d).

16         In this case, the Court is not going to decide the

17  ultimate issue as to whether the underlying statute, Title

18  8, United States Code Section 1409(a) requires or doesn't

19  require the blood relationship, but I believe he's made a

20  plausible grounds for relief and that the immigration

21  authorities in the deportation should have been advising of

22  all the true facts.

23         So that the Court in this instance -- and then

24  it's also clear to the Court, based on the expert opinion

25  submitted by the Defense, that he was legitimated under

25

1   Mexican law.  And it was done at a time no litigation was

2   pending.  It was 1979.  The father has always held him out

3   to be his son.  The father has served our country.  There's,

4   I believe, no dispute about any of those facts.

5           I think all of that information should have been

6   provided to the Immigration Court, so I do think that the

7   Government has failed to show the absence of prejudice.  So

8   I do think that the underlying deportation was a problem.

9   And therefore, because the Defense has shown a prima facie

10  case of prejudice that the Government has not adequately

11  rebutted, and recognizing that I think in this instance

12  perhaps -- I have no problem if the Government appeals, and

13  then the Ninth Circuit can review whether or not this is a

14  circumstance where prejudice could not be shown because of

15  the underlying statute.  I think that that would benefit all

16  concerned.

17          So the Court will grant the motion to dismiss the

18  indictment and then recognize that the parties may both

19  exercise any remedies that you have.  Whether or not he then

20  goes before the Immigration Court in the interim or

21  immigration authorities I will leave up to those decision-

22  makers.

23          MR. HENSSLER:  Thanks, your Honor.

24          MR. LESHNER:  Thanks, your Honor.  Have a nice

25  afternoon.

26

1          THE COURT:  Thank you.  It's a very, very

2  interesting legal issue.  I'm slightly distinguishing the

3  ruling of Judge Gonzalez just saying that I think that he's

4  shown --

5          MR. HENSSLER:  Wait.  Mr. Cruz-Valles.

6          THE COURT:  Oh, that's okay.  I think that he's

7  shown -- that you've at least made a prima facie showing.

8  And in other immigration contexts where at least you've done

9  that, that that's sufficient to then not go forward on a

10 criminal indictment.

11         MR. HENSSLER:  Thank you, your Honor.

12         THE COURT:  You're welcome.

13     (Proceedings concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

27

1         I certify that the foregoing is a correct

2  transcript from the electronic sound recording of the

3  proceedings in the above-entitled matter.

4

5  s/Shonna Mowrer                         6/18/08
   Transcriber                            Date

6

   FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

7

8

   S/L.L. Francisco
9  L.L. Francisco, President
   Echo Reporting, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25